**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **MARCEIA L. TUGGLE,** ) | |
| ) | **CIVIL ACTION FILE** |
| **Plaintiff,** ) | **NO.: 1:13-CV-03211-RWS-LTW** |
| ) | |
| **vs.** ) | |
| ) | |
| **THOMPSON HINE, LLP,** ) | |
| ) | |
| **Defendant.** ) | |

## SECOND AMENDED COMPLAINT

COMES NOW, the Plaintiff MARCEIA L. TUGGLE files this, her Second Amended Complaint, and shows the Court as follows:

## NATURE AND PURPOSE

1.

This action arises under the provisions of Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, as amended, 42 U.S.C. 2000e, et. seq. ("Title VII"), 29 U.S.C § 2611(11). Ms. Tuggle seeks declaratory and injunctive relief and damages to redress the deprivation of her rights by Defendants through discriminatory employment practices on the basis of race, retaliation, hostile work environment, negligent and intentional infliction of emotional distress, and negligent hiring, training, retention and supervision.

## JURISDICTION AND VENUE

### 2.

The jurisdiction of this Court is invoked pursuant to Title VII, and 28 U.S.C. 1343. Ms. Tuggle further invokes the pendent jurisdiction of this Court to hear and decide claims arising under the laws of the State of Georgia. Venue is also appropriate in this judicial district because Ms. Tuggle and the Defendants reside or have offices in this judicial district and in this division and the unlawful employment practices occurred in this judicial district. Therefore, venue is proper in this Court pursuant to 28 U.S.C. 1391(b).

## PARTIES

### 3.

Plaintiff, Marceia Tuggle ("Plaintiff" or "Ms. Tuggle") is an African-American female citizen of the United States who resides in DeKalb County, Georgia. At all times relevant to this action, Ms. Tuggle was employed by Defendant at its Atlanta, Georgia location.

### 4.

Defendant, Thompson Hine, LLP ("Defendant" or "Thompson Hine, LLP") does business within the Northern District of Georgia and is subject to the jurisdiction and venue of this honorable Court. The discriminatory acts of

Thompson Hine, LLP upon Ms. Tuggle all occurred within the Northern District of Georgia.

5.

Defendant, Thompson Hine, LLP is an Ohio Limited Liability Partnership (Law Firm) authorized to do business in the Northern District of Georgia. Defendant Thompson Hine, LLP may be served by serving its registered agent for service of process, Debbie Read, Esq., Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114. Defendant employs more than 500 employees and is subject to suit under Title VII and Section 1981.

## ADMINISTRATIVE PROCEDURES

6.

Ms. Tuggle timely filed charges of discrimination against the Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about June 7, 2013. (See Exhibit "A").

7.

On or about June 25, 2013, Ms. Tuggle received from the EEOC "Notice of Right to Sue" entitling her to commence this action within ninety (90) days of her receipt of that notice. (See Exhibit "B").

8.

Ms. Tuggle has satisfied all private, administration and judicial prerequisite to the institution of this action.

## FACTUAL ALLEGATIONS

9.

On or about September 29, 2008, Ms. Tuggle interviewed for the position of "Floater Legal Secretary" with Defendant at its Atlanta Office. Upon being offered and accepting the floater legal secretary position, Sarah Turner, her supervisor, telephoned Ms. Tuggle at home and informed Ms. Tuggle that the position would be called "Special Services (Floater) Secretary.

10.

Ms. Tuggle was hired by Thompson Hine, LLP on October 16, 2008 to work as a Special Services Secretary. This position was not the one she applied for, and was not commensurate with Ms. Tuggle's qualifications and skill level.

11.

Ms. Tuggle initially agreed to the "Special Services (Floater) Secretary title change based on Ms. Turner's representation that she would be utilized in a limited capacity to relieve the receptionist for lunch breaks and to help out with hospitality on an as-needed basis.

12.

On October 8, 2008, Ms. Tuggle received an acceptance letter for the position of "Special Services Secretary", and the word "Floater" was omitted from the acceptance letter.

13.

On October 16, 2008, Ms. Tuggle's first day of employment with Defendant, Ms. Turner introduced Ms. Tuggle to Defendant's employees as a "Special Services (Floater) Secretary."

14.

During her negotiations, Ms. Turner told Ms. Tuggle that, in lieu of Ms. Tuggle's requesting salary, Defendant would, after six months, review Ms. Tuggle's work performance and would adjust her salary at that time commensurate with her performance and skill level. However, Ms. Tuggle did not receive a merit increase until 2010 and did not receive a year-end bonus until 2009. Ms. Tuggle's merit increase and year-end bonus were not commensurate with her skill level or performance evaluations relative to other white employees at Defendant Thompson Hine's Atlanta office.

15.

On December 15, 2008, Ms. Tuggle was told by Ms. Turner to "own" the receptionist and hospitality positions because "that is why [Ms. Tuggle] was hired and that is why she [Ms. Turner] was able to justify hiring [Ms. Tuggle]."

16.

Ms. Tuggle was discriminated against by Defendant Thompson Hine due to its deceptive hiring practices and its attempts to hire and demote.

17.

Defendant does not consider Ms. Tuggle to be a legal secretary, although Ms. Tuggle has an Associate in Applied Science Degree in Legal Secretarial Science from Robert Morris College in Chicago, Illinois.

18.

On or about July 27, 2012, Ms. Turner told Ms. Tuggle "But do realize that you are not a secretary." Ms. Turner has consistently run interference with Ms. Tuggle's attempts to obtain more secretarial/word processing duties and less hospitality/receptionist duties.

19.

On October 16, 2008, Ms. Turner hired Ms. Tuggle as a secretary, whether "special services" or "floater", Ms. Tuggle did accept a secretarial position.

20.

In October 2008, Ms. Tuggle sought permission to begin working with Defendant's Firm-wide Word Processing Team. In November 2008, Ms. Tuggle and obtained such permission. Although not an official member of Defendant's Firm-wide Word Processing Team at that time, for all practical purposes, Ms. Tuggle was a recognized member and shared in the responsibilities of other Firm-wide Word Processing Operators from November 2008 forward.

21.

According to an Employment Status Publication dated April 16, 2011, and made effective as of April 15, 2011, Ms. Tuggle officially became a member of Defendant Thompson Hine's Firm-wide Word Processing Center ("VFWPC").

22.

Based upon this Employment Status Publication, on or about April 15, 2011, Ms. Tuggle's new supervisor should have been Barbara Lawson, Cleveland Word Processing Manager.

23.

Ms. Turner never shared this publication with Ms. Tuggle and Ms. Tuggle never received a copy of it. Ms. Tuggle learned of this April 2011 publication during preparation for the filing of this lawsuit. As such, Ms. Tuggle continued in her role as Special Services Secretary and was supervised solely by Ms. Turner.

Ms. Turner allowed Ms. Tuggle to continue helping out with word processing and secretarial needs so long as she was not needed to perform "Special Services".

24.

On or about September 12, 2012, Ms. Tuggle was informed by Ms. Turner that beginning January 1, 2013, she would be supervised by Fran McClean, Manager of Secretarial Services in her new capacity as Manager of the VFWPC.

25.

At all times relevant, up to and including December 31, 2012, Ms. Tuggle was supervised by Ms. Turner even after Ms. Tuggle became a member of Defendant's Word Processing Team made effective April 15, 2011.

26.

Ms. Tuggle currently holds two positions simultaneously with Defendant: (1) Legal Secretary/Word Processing Operator; and (2) Special Services Secretary.

27.

Ms. Turner is the Atlanta Office Administrator and Ms. Tuggle directly and indirectly reports to Ms. Turner.

28.

Ms. Tuggle's job duties as both a Word Processing Operator and Special Services Secretary were supervised and managed by Ms. Turner, even after

December 31, 2012, when Ms. Tuggle again became a member of Defendant's VFWPC.

29.

White employees in similar or the same position as Ms. Tuggle have a primary off-site supervisor and an on-site office manager. Ms. Tuggle's primary supervisor and on-site office manager has remained the same up to, including and beyond December 31, 2012.

30.

Ms. Tuggle is being discriminated against by Defendant because of her race, Black, due to Defendant's continued interference with her primary responsibilities as a member of its VFWPC while other white employees in the same or similar position as Ms. Tuggle are allowed to perform their primary job functions.

31.

On or about April 27, 2009, Ms. Turner deliberately and maliciously deleted portions of Ms. Tuggle's primary job responsibilities as a member of Defendant's VFWPC by disseminating that altered document to Defendant's employees so as to deceive and deny Ms. Tuggle the opportunity to perform her primary job functions. Ms. Turner did this in order to discriminate against Ms. Tuggle and to maintain control over Ms. Tuggle's workflow. Ms. Tuggle was further discriminated against because other white employees in the same or similar position as her did

9

not receive the same altered Firm-wide policy wherein the main function of their primary job responsibilities was deleted and disseminated to Defendant's employees.

32.

Defendant continues to discriminate against Ms. Tuggle by violating its own VFWPC guidelines and failing to correct Ms. Turner's blatant and deliberate discriminatory acts.

33.

In addition to Defendant's yearly 6-month and 12-month employee evaluations, Ms. Tuggle was evaluated, written up and/or counseled by Ms. Turner and Mr. Kevin Kendall, HR Manager (Cleveland) every 6 and 8 months of her employment beginning in December 2010 regarding Defendant's policies and time and attendance matters while other white employees in the same or similar position as Ms. Tuggle were not.

34.

On or about December 16, 2010, Ms. Turner fraudulently and deceptively altered Ms. Tuggle's submitted and "approved" December 10, 2010 employee timecard so as to reduce her number of hours worked for that day.

35.

On December 20, 2010, Ms. Tuggle requested that Ms. Turner restore her timecard to its original hours.

36.

On December 20, 2010, Ms. Turner and Defendant Thompson Hine sent Ms. Tuggle an email denying any reduction of hours to her December 10, 2010, employee timecard.

37.

On December 21, 2010, Ms. Tuggle was able to prove that Ms. Turner had fraudulently and deceptively altered her employee timecard so as to reduce her number of hours worked.

38.

On December 29, 2010, Defendant and Ms. Turner, only after having been caught in an attempted cover-up, did acknowledge the fraudulent and deceptive alteration of Ms. Tuggle's December 10, 2010, employee timecard.

39.

Defendant conspired and attempted to cover-up the fraudulent and deceptive altering of Ms. Tuggle's December 10, 2010, employee timecard for its own benefit and to discriminate against Ms. Tuggle by collectively condoning, dismissing, and going along with this fraudulent alteration.

40.

Ms. Tuggle complained to Russell Rogers, Atlanta Office Partner-In-Charge in December 2010, June 2011, and September 2012, regarding her unfair and discriminate treatment by Ms. Turner, and he failed to act. In fact, Ms. Tuggle was written up after each of her complaints to Mr. Rogers.

41.

Ms. Tuggle complained to one of Defendant's labor attorneys on October 4, 2012, regarding her unfair and discriminate treatment by Ms. Turner who, in turn, spoke with Mr. Tony Brown the same evening. Ms. Tuggle received a written warning the next day, October 5, 2012.

42.

Ms. Tuggle complained to Tony Brown, Chief Human Resources Officer of Defendant, on more than four occasions regarding her unfair and discriminate treatment and he failed to act.

43.

On April 11, 2013, Ms. Tuggle received a "Final Written Warning – Tardiness" for being late 13 times from January 1, 2013 to April 11, 2013.

44.

On April 11, 2013, Ms. Tuggle was notified by Russell Rogers, Fran McClean and Kevin Kendall (all of whom she complained to regarding

discriminate and disparate treatment) that "If [she is] late to work one additional time, [her] employment with Thompson Hine LLP will be terminated."

45.

On or about March 22, 2013, Defendant, through its Atlanta Office Administrator Ms. Turner, did create a false Kronos analysis "low-balling", omitting all together, or making excuses for tardies and use of personal unscheduled hours of other white employees in the same or similar position as Ms. Tuggle.

46.

Mr. Brown and Mr. Rogers conspired with Ms. Turner to continually harass, intimidate, retaliate against and otherwise discriminate against Ms. Tuggle in order to, among other things, alter, destroy, fabricate and otherwise hide or do away with other white employees' time and attendance records.

47.

Mr. Brown, Kevin Kendall and Sarah Turner conspired with Fran McClean to continually harass, intimidate, retaliate against and otherwise discriminate against Ms. Tuggle by, among other things, failing to keep accurate and reliable time and attendance records, i.e., "emails" in order to "keep track of Kronos from afar" for other white employees in the same or similar position as Ms. Tuggle in

accordance with Ms. McClean's statements of December 26, 2012, and April 1, 2013.

48.

Mr. Rogers conspired with Ms. Turner to continually harass, intimidate, retaliate against and otherwise discriminate against Ms. Tuggle in order to, among other things, cover up, alter, destroy, fabricate and otherwise hide or do away with other white employees' time and attendance records.

**<u>COUNT I</u>**

**<u>VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER TITLE VII</u>**

49.

Ms. Tuggle adopts and incorporates paragraphs 1-48 as if fully set forth herein.

50.

On April 11, 2013, Ms. Tuggle was informed that she was being placed on "permanent probation" and that this permanent probation status was effective as of October 5, 2012, the date of her last written warning.

51.

On April 11, 2013, during the final written warning meeting, Ms. Tuggle was told by Kevin Kendall that "if you are here 10 more years and late one time

14

after that 10th year, you will be terminated." Russell Rogers and Fran McClean supported this position.

52.

Ms. Tuggle is discriminated against because of her race because she is not allowed to be "one minute late" and placed on permanent probation for time and attendance reporting matters while other white employees are allowed to be late or take time off without fear of reprimand.

53.

Ms. Tuggle has been discriminated against because of her race, Black, because other white employees in Defendant's Atlanta Office whose time and attendance deficiencies are similar to or exceed Ms. Tuggle's have not been reprimanded in the same or similar manner as Ms. Tuggle, have not been given a final warning or otherwise reprimanded for their time and attendance deficiencies. In addition, other white employees who have time and attendance deficiencies are not held to the same reporting requirements as Ms. Tuggle.

54.

Ms. Tuggle is not allowed any grace time in the morning to be late for work and particularly, cannot use "traffic" as an excuse, may not shorten her lunch time to make up for being late without prior approval and approval is based on the needs

of the office/case-by-case, and is strictly required to round her arrival time to the nearest 5 minutes and to be at her desk no later than 11:00 a.m.

55.

Ms. Tuggle is discriminated against because other white employees in Defendant's Atlanta Office are allowed up to a 15-minute grace period, may regularly use "traffic" as an excuse, may shorten their lunch time to make up for being late regardless of the needs of the office and is not strictly required to be at their desk no later than their start time.

56.

In response to Ms. Tuggle's pleas for fairness, on April 11, 2013, during the final written warning meeting, Defendant, through its Atlanta Office Partner-in-Charge Russell Rogers, told Ms. Tuggle that he is "not going to stand in the way of what they are *trying* to do….but if a tree falls on your car, I will *try* to help you."

57.

On October 5, 2012, and again on April 11, 2013, Defendant informed Ms. Tuggle that she is not allowed to take any "unscheduled" days off.  On October 5, 2012, Ms. Tuggle was told by Ms. Turner and Kevin Kendall that she is expected to come to work even if she is sick.  On April 12, 2013, Defendant told Ms. Tuggle that she is not allowed to have "unscheduled absences" except in an emergency. Defendant has defined emergency to mean "a death in [Plaintiff's] family."  Any

16

time taken off by Ms. Tuggle must be pre-approved and in writing. Defendant was told this because of the "June 29, 2011, Unscheduled Absences Written Warning" and the "February 21, 2012, Three Days Left Warning" she received.

58.

Ms. Tuggle was discriminated against because Defendant does not have a policy in place specifically stating that an employee must have personal time remaining at the end of each calendar year or at any point during the year.

59.

Ms. Tuggle was discriminated against because other white employees in its Atlanta Office who have "historically" exhausted their personal time or who have come close to exhausting their personal time within a calendar year have not been written up and/or counseled or otherwise reprimanded or held to the same standards as Ms. Tuggle regarding use of personal time.

60.

Ms. Tuggle was discriminated against because of her race, Black, because her annual evaluations have been negatively affected regarding time and attendance deficiencies while other white employees in Defendant's Atlanta Office with the similar or worse time and attendance deficiencies received no adverse remarks on their annual evaluations.

61.

On April 11, 2013, Ms. Tuggle was required to begin sending an "in the office" notification email ("the email"), in addition to normal reporting procedures, within 5 minutes after her start time. In addition, Ms. Tuggle's time and attendance are strictly monitored.

62.

Ms. Tuggle is being discriminated against because other white employees in the same or similar position as her and who have time and attendance deficiencies are not required to send an in the office email notification nor an in the office email notification within 5 minutes of their arrival time and their time and attendance are not strictly monitored.

63.

Ms. Tuggle is required to obtain pre-approval in writing in order to work past the end of her 7:00 p.m. shift so as to complete work assignments or for any overtime requests.

64.

Ms. Tuggle is discriminated against because no other employee in Defendant's Atlanta Office is required to obtain pre-approval in writing in order to stay and finish their work.

65.

Ms. McClean keeps a running total of the number of times Ms. Tuggle has missed sending or was late sending the in-the-office email notification.

66.

Ms. McClean has not kept a running total of the number of missed or late in-the-office email notifications of other white employees in the same or similar position as Ms. Tuggle.

67.

Ms. Tuggle is strictly required to send an email to Defendant indicating she is "leaving" any time she works past the end of her 7:00 p.m. work shift for time and attendance tracking purposes.

68.

Ms. Tuggle is discriminated against because other white employees in Defendant's Atlanta Office are not required to send a "leaving" email if/when they stay past the end of their work shift.

69.

Defendant engaged in policies and practices which willfully and unlawfully discriminated against Ms. Tuggle on the basis of her race. Ms. Tuggle has suffered, and in the future will suffer, actual damages in the form of lost wages,

benefits, mental anguish, emotional distress, depression and humiliation as a result of Defendant's discriminatory employment practices.

## COUNT II

## RETALIATION OF TITLE VII and § 1981

70.

Ms. Tuggle adopts and incorporates paragraphs 1-69 as if fully set forth herein.

71.

On December 20, 2010, and again on December 27, 2010, Ms. Tuggle complained to Defendant Thompson Hine's supervisors, agents, managers, and/or employees that, among other things, her December 10, 2010, employee timesheet had been fraudulently and deceptively altered by Ms. Turner. Ms. Tuggle received a formal warning on December 31, 2010.

72.

Ms. Tuggle complained of discriminate and disparate treatment on June 27, 2011, to Mr. Russell Rogers. Ms. Tuggle received a written warning on June 29, 2011.

73.

Ms. Tuggle complained of harassment on February 21, 2011, and received a formal warning on the one-year anniversary date thereof, to wit: February 21, 2012.

74.

Ms. Tuggle complained of discriminate and disparate treatment on September 10, 2012,and again on October 4, 2012, and received a formal written warning on October 5, 2012.

75.

When Ms. Tuggle received a "Final Written Warning – Tardiness" on April 11, 2013, she was being retaliated against because of her repeated complaints of discriminate and unfair treatment.

76.

After Ms. Tuggle complained to Defendant of the discrimination and filed her charge on June 7, 2013, with the EEOC, Ms. Tuggle was retaliated against by being told that failure to send the email "may be considered insubordination and may result in disciplinary action, including termination of employment."

77.

On or about July 1, 2013, Defendant told Ms. Tuggle that she must send an email each day within 5 minutes after her start time letting them know she had arrived to work.

78.

According to Defendant, the reason Ms. Tuggle was told that she needed to send Ms. McClean an email each day when she arrived to work was "because of [her] long-standing history with tardiness and attendance issues. … it is something that we do on a regular basis for employees who have had tardiness and attendance issues."

79.

Defendant is discriminated and retaliated against because of her race because other white employees in the same or similar position as Ms. Tuggle and/or who have a "long-standing history with tardiness and attendance issues" are not required to send an email each day and/or within 5 minutes after their start time. There were no time restrictions on sending the daily email until after Ms. Tuggle filed her EEOC claim. Ms. Tuggle was not informed that she must send the email within 5 minutes after her start time until after she complained about discrimination.

80.

In addition to having to send the in-the-office email notification before beginning any work, Ms. Tuggle was also required to obtain prior written approval in order to perform any work prior to her start time. If Ms. Tuggle arrives 5 or 10 minutes early for work, and someone asks her for assistance, Ms. Tuggle is not allowed to assist without prior written approval from Ms. McClean.

81.

If Ms. Tuggle arrived to work early, she was not allowed to sit at her desk. Instead she had to sit and wait in the break room.

82.

If Ms. Tuggle notified the Defendant that she was going to be late to work because of a doctor's appointment, she had to specify the exact time she would be in and if she was a minutes late, she "may be terminated".

83.

Ms. Tuggle is being discriminated against because other white employees in the same or similar position as her are not required to obtain prior written approval in order to perform their job duties, are not required to know exactly what time they will arrive at the office following a scheduled appointment or face reprimand, were not told to sit in the break room if they arrive early to work, or threatened with termination for failure to send the in-the-office email notification.

84.

On or about July 1, 2013, Ms. Tuggle was retaliated against by Defendant for complaining and seeking help regarding her complaints of discriminate treatment by being labeled "confrontational", "disrespectful" and "argumentative".

85.

Ms. Tuggle engaged in protected activity under Title VII and § 1981 and as a direct and proximate result of Ms. Tuggle's protected activity, Defendant subsequently took adverse employment action against her.

86.

Defendant retaliated against Ms. Tuggle in violation of the Title VII. and § 1981 by engaging in a course of conduct which included verbal threats and abuse, disparate treatment, and a denial of compensatory leave and modified duty because of Ms. Tuggle's complaint of Defendant's discriminatory practices.

## COUNT III

## NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

87.

Ms. Tuggle adopts and incorporates paragraphs 1-86 as if fully set forth herein.

88.

Defendant did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when, on or about April 15, 2013, Ms. Tuggle was told that she is not allowed to have any unscheduled absences or be late for work for any reason except an emergency. Defendant Thompson Hine has defined emergency to mean "("i.e., a death in the family").

89.

On or about July 1, 2013, Defendant did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when she was told that she must send her supervisor, Fran McClean, an email within 5 minutes after her start time and that failure to send "the email" "may be considered insubordination and may result in disciplinary action, including termination of employment."

90.

On or about July 1, 2013, Defendant did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when she was informed that even if she is on time for work, she may be terminated for sending a "late" email.

91.

Defendant did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when she was denied the opportunity to enhance either

her performance evaluations and/or certain of her employment responsibilities as outlined in Defendants VFWPC guidelines.

92.

Defendant did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when she was told that she is on permanent employment probation with Defendant and "if you are here 10 more years and late one time after that 10th year, you will be terminated."

93.

On or about April 11, 2013, Defendant, through its Atlanta Office Partner-in-Charge, Russell J. Rogers, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when he told her that he is "not going to stand in the way of what they are *trying* to do….but if a tree falls on your car, I will *try* to help you."

94.

On or about September 20, 2013, Defendant, through its Chief Human Resources Officer Tony Brown, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when he ignored her complaints and told her that the discriminate and disparate treatment she complained of "could not be substantiated…. but if you get something else, let me know." Ms. Tuggle was told but otherwise, "you're doing good…just keep sending Fran your email."

95.

On or about September 20, 2013, Defendant, through its Chief Human Resources Officer Tony Brown, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when she was told that her white counterpart, whose time and attendance deficiencies far exceed Ms. Tuggle's, "gets 5 or 15 minutes, something like that" before she is considered late. Ms. Tuggle get's no minutes or she will be terminated.

96.

On or about September 23, 2013, Defendant, through Ms. Tuggle's Supervisor and Defendant's Secretarial Services Manager, Fran McClean, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when Ms. McClean shared certain of Ms. Tuggle's personal and confidential health information with Ms. Turner.

97.

Defendant, through its Atlanta Office Administrator, Sarah Turner, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle when, within the first three months of her employment with Defendant, she was told to "own" the receptionist and hospitality positions because "that is why you were hired, and that is why I was able to justify hiring you." Ms. Tuggle continues

to be harmed by this statement because her Special Services Secretary position takes precedence over legal secretarial or word processing work.

98.

Defendant, through its Atlanta Office Administrator, Sarah Turner, did willfully, negligently and intentionally inflict emotional distress upon Ms. Tuggle as a result of the continuous harassment, tracking, retaliation and discriminate and unfair treatment that she has endured for the entire five years of her employment with Defendant Thompson Hine.

99.

The acts of the Defendant were so insulting as to naturally humiliate, embarrass, and intimidate Ms. Tuggle, and have subjected her to serious emotional distress and mental suffering.

100.

The acts of the Defendant were so egregious so as to systematically frighten, hound, intimidate, bully, threaten, harass, discriminate and retaliate against, fabricate and/or alter material documents that would show that other white employees in the same or similar position as Ms. Tuggle should have been reprimanded in the same or similar manner as Ms. Tuggle, but were not.

101.

In addition to the relief afforded by Title VII, Ms. Tuggle seeks, as a result of the intentional infliction of mental distress upon her, compensatory damages incurred or to be incurred by her and punitive damages in an aggregate amount in excess of $10,000.00.

## COUNT IV

## NEGLIGENT HIRING, TRAINING, RETENTION AND SUPERVISION

102.

Ms. Tuggle adopts and incorporates paragraphs 1-101 as if fully set forth herein.

103.

Defendant had knowledge about the discriminatory practices that were occurring with respect to Ms. Tuggle, between the supervisors, agents, managers and/or employees, including but not limited to, the disparate treatment and the hostile work environment created by supervisors, agents, managers and/or employees named previously in this Complaint against Thompson Hine, LLP.

104.

Defendant had knowledge of the discriminatory practices by the previously named individuals, which have and had the purpose and effect of chilling, discouraging and interfering with Ms. Tuggle's federally protected rights.

105.

At all material times relevant herein, Defendant had a duty to properly hire, train, retain, supervise and monitor its employees and agents, and to take exercise and maintain ordinary and reasonable care for the civil rights of the employees of Defendant including Ms. Tuggle.

106.

Defendant further undertook to train its employees and agents in the manner of operations of its business and to ensure that its managers and agents did not violate the civil rights of its employees.

107.

Defendant is in violation of its own Anti-Harassment Policy based upon its failure to act or otherwise respond according to its policies and procedures regarding Ms. Tuggle's repeated claims of harassing, discriminate, and disparate treatment.

108.

Defendant breached that duty to Ms. Tuggle.

109.

As a direct, foreseeable, and proximate result of Defendant's breach of said duties, Ms. Tuggle was caused to suffer damages, including, but not limited to, shame, embarrassment, annoyance, inconvenience, humiliation, mental anguish,

emotional distress, depression and anxiety attacks. Therefore, Ms. Tuggle is entitled to compensatory and punitive damages in an amount to be determined by the enlightened conscious of fair and impartial jurors.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Ms. Tuggle, respectfully prays as follows,

1) Ms. Tuggle is entitled to permanent injunctive relief prohibiting Defendant from discriminating against Ms. Tuggle and other similarly situated individuals,

2) Defendant instate Ms. Tuggle in her current or higher position, or alternatively, award Ms. Tuggle "front pay",

3) That pursuant to 42 U.S.C §§ 1981a(a)(2) and 1981a(b)(1), and in addition to the relief specified in 42 U.S.C. § 200e5(g)(1), Ms. Tuggle recover compensatory and punitive damages from Defendant in an amount to be proven at trial;

4) Ms. Tuggle recovers back pay and benefits;

5) Ms. Tuggle recovers pre and post judgment interest;

6) Ms. Tuggle recovers all taxable and non-taxable costs as well as attorney's fees as provided by law;

7) That pursuant to 42 U.S.C. § 1981(a)(c)(1) Ms. Tuggle have a trial by jury, and

8)     Grant such additional relief as the Court deems proper and just.

This 13th day of November, 2013

                Respectfully submitted,

                **THE BURKE LAW GROUP, LLC**

                <u>/S/ E. Earle Burke</u>
                E. Earle Burke
                Ga. Bar No. 095550
                Attorney for Plaintiff

199 Peters Street
Suite A
Atlanta, Georgia 30313
Telephone: (404) 688-1210
Facsimile: (404) 688-1251
eburke@burkelawatl.com